No. 15-1572

---

**IN THE**
## UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

---

STEPHANIE ZIMMECK,

       Plaintiff-Appellant,

  v.

MARSHALL UNIVERSITY BOARD OF GOVERNORS dba Marshall University
Joan C. Edwards School of Medicine; AARON MCGUFFIN, individually and
as Senior Associate Dean for Student Affairs; TRACY LEGROW; individually and
as Assistant Dean for Academic Affairs; ROBERT C. NERHOOD, individually
and as Interim Dean of Marshall School of Medicine; MARIA VEITIA,
individually and as Assistant Dean for Student Affairs; inclusive

       Defendants-Appellees.

and

JOSEPH L. SHAPIRO, individually and as Dean of the Marshall University of
School of Medicine.

       Defendant.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

**D. Ct. Case No.** 3:13-cv14743
The Honorable Judge Robert C. Chambers

---

## **APPELLANT'S OPENING BRIEF**

---

JASON J. BACH
THE BACH LAW FIRM, LLC
7881 W. Charleston Blvd., Suite 165
Las Vegas, NV 89117
Telephone: (702)925-8787
Attorney for Appellant

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __15-1572__    Caption: __Zimmeck v. Marshall University Board of Governors, et. al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Stephanie Zimmeck__
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?  ☐YES ☑NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?      ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature:  /s/ Jason J. Bach _____        Date:  _____8-4-15_____

Counsel for:  Appellant _____

## CERTIFICATE OF SERVICE
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on _____8-4-15_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Jason J. Bach _____                    _____8-4-15_____
        (signature)                                                          (date)

## **TABLE OF CONTENTS**

Table of Contents ....................................................................................i

Table of Cases and Authorities Cited .................................................. iii

I.    Jurisdictional Statement ...........................................................1

II.   Statement of Issues ...................................................................2

III.  Statement of the Case...............................................................2

        A.    Factual Background ........................................................2

        B.    Procedural History .......................................................10

IV.   Summary of the Argument ......................................................14

V.    Standard of Review.................................................................16

    A.    Summary Judgment Standard.................................................16

    B.    12(b)(6) Standard ..................................................................16

VI.   Argument ................................................................................18

    A.    The District Court Erred in Dismissing Zimmeck's ADA and
Rehabilitation Act Claims ..............................................................18

        I.    The District Court Erred in Dismissing Zimmeck's ADA and
Rehabilitation Act Retaliation Claims .................................18

        II.   The District Court Erred in Dismissing Zimmeck's ADA and
Rehabilitation Act Discrimination Claims .........................20

            a. The District Court Erred in Finding Zimmeck was not
"Otherwise Qualified" for the Program.........................21

            b. The District Court Erred in Finding Zimmeck did not
Present Sufficient Evidence that she was Excluded on the
Basis of her Disability ...................................................28

B.   The District Court Erred in Dismissing Zimmeck's Due Process Claims ................................................................................. 31

     I.   Zimmeck Established in her Complaint that she was Denied her Right to Pre-deprivation Due Process, Including Prior Notice and a Full Opportunity to Be Heard Prior to her Dismissal from MUSOM .................................................... 31

     II.  Zimmeck Established in her Complaint that the Conduct of MUSOM Officials in Dismissing her from the Medical School "Shocks the Conscience" for Purposes of her Substantive Due Process claim ........................................... 38

VII.   Conclusion .................................................................................... 41

VIII.  Statement Regarding Oral Argument ............................................ 43

IX.    Certificate of Compliance ............................................................ 44

X.     Certificate of Service .................................................................... 45

## TABLE OF CASES AND AUTHORITIES

CASES:

*Alexander v. Choate*, 469 U.S. 287 (1985) ..............................................22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................17

*Ausherman v. Bank of Am. Corp.*, 352 F.3d 896 (4th Cir.2003) ...........................16

*Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999) ...........................................21

*Bell v. Burson*, 402 U.S. 535 (1971) .......................................................34

*Board of Curators of the Univ. of Missouri v. Horowitz*, 435 U.S. 78 (1977) .36, 37, 38

*Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570 n.7 (1972)................34

*Butler v. Rector & Bd. of Visitors of the College of William and Mary*, 121 Fed.App'x 515 (4th Cir. 2005)...................................................35, 36, 38

*Canal Ins. Co. v. Distrib. Servs., Inc.*, 320 F.3d 488 (4th Cir.2003) ....................16

*Castle v. Marquardt*, 632 F. Supp. 2d 1317 (N.D. Ga. 2009) ..........................33, 34

*Chandler v. City of Dallas*, 2 F.3d 1385 (5th Cir.1993) .......................................22

*Connelly v. University of Vermont and State Agr. Col.*, 244 F.Supp. 156 (D. Vt., 1965)……………………………………………………………………..38, 41

*Constantine v. Rectors, George Mason Univ.*, 411 F.3d 474 (4th Cir., 2005)…....20

*Cmty. Coll. v. Davis*, 442 U.S. 397 (1979) ...........................................21

*Doe v. University of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264-65 & n. 9 (4th Cir. 1995) ..................................................................................21

*Francis v. Giacomelli*, 588 F.3d 186 (4th Cir.2009)……………………………..18

*Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205 (4th Cir. 2002) ...........18

*Gates v. United States*, 600 F.3d 333, 341 (4th Cir. 2010)......................................34

*Goss v. Lopez*, 419 U.S. 565, 581 (1975) ..........................................................33, 34

*Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454 (4th Cir., 2012)
...............................................................................................24,25,26, 28, 29,30

*Haneke v. Mid–Atl. Capital Mgmt.*, 131 Fed.Appx. 399 (4th Cir. 2005) ..............28

*Haulbrook v. Michelin N. America*, 252 F.3d 696, 706, n. 3 (4th Cir., 2001) .19, 30

*Hooven–Lewis v. Caldera*, 249 F.3d 259 (4th Cir. 2001) ......................................18

*Lewin v. Medical College of Hampton Roads*, 916 F. Supp. 1161 (E.D. Va. 1996) ...............................................................................................................36, 37

*PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 n. 38 (2001) ...................................22

*Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) .......................................................................................37, 38

*Ricci v. DeStefano*, 557 U.S. 557 (2009) ..............................................................16

*Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 n. 3 (4th Cir.1997) ..............29

*Matthews v. Eldridge*, 424 U.S. 319 (1976) .....................................................34, 36

*McCorkle v. Bank of Am. Corp.*, 688 F.3d 164 (4th Cir.2012) ............................16

*Sch. Bd. v. Arline*, 480 U.S. 273, 287 n. 17 (1987) ...............................................22

*Schuler v. Univ. of Minn.*,788 F.2d 510, 514 (8th Cir. 1986), cert. denied, 479 U.S. 1056 (1987) .................................................................................................36, 38

*Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 570 (2007) .....................................17

*Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209 (4th Cir.1994) .............................21

iv

*U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002) .................................................23

*Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19 (1st Cir. 1991) ...........................24

*Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041 (9th Cir. 1999) ...................24

STATUTES:

29 U.S.C. § 794(a) ...............................................................................20
42 U.S.C. § 12132 ................................................................................20
42 U.S.C. § 12203 (2012) .....................................................................18
§ 504 of the Rehabilitation Act ...............................................2, 20, 21
Title II of the ADA ...................................................................2, 20, 21

RULES:

Federal Rules of Civil Procedure 8(a)(2) ..............................................18
Federal Rules of Civil Procedure 12(b)(6) ...............................10, 16, 17

v

# I.

## <u>JURISDICTIONAL STATEMENT</u>

Subject matter jurisdiction in the United States District Court for the Southern District of West Virginia was based upon a federal question pursuant to 28 U.S.C. § 1331; diversity of citizenship pursuant to 28 U.S.C. § 1332; and civil rights action pursuant to 28 U.S.C. § 1343.

The United States District Court for the Southern District of West Virginia entered its final judgment on May 7, 2015. 3 JA 1592.  Zimmeck timely filed a notice of appeal on May 26, 2015. 3 JA 1593.  This appeal is timely under Federal Rules of Appellate Procedure 4(a)(1).

This Court has jurisdiction for appellate review under 28 U.S.C. § 1291.

## II.

## STATEMENT OF ISSUES

1.  Whether the district court erred in dismissing Zimmeck's ADA and Rehabilitation Act Retaliation Claims.

2.  Whether the district court erred in dismissing Zimmeck's ADA and Rehabilitation Act Discrimination Claims.

3.  Whether the district court erred in dismissing Zimmeck's Due Process Claims.

## III.

## STATEMENT OF THE CASE

**A.    Factual Background.**

This is an action brought pursuant to Title II of the Americans with Disabilities Act (ADA); Section 504 of the Rehabilitation Act of 1973 (RA); and 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution, alleging denial of reasonable accommodations, retaliation for engaging in protected activity, infringement of Plaintiff Stephanie Zimmeck's (Zimmeck) right to due process.

In August 2009, Zimmeck started medical school at Marshall University School of Medicine ("MUSOM").  Zimmeck successfully completed her first two years of the program. *JA 014* ¶ 16, Complaint.

Throughout Zimmeck's enrollment at MUSOM, the medical school had in place a Student Impairment Assistance Policy to promote student wellness through early detection of potentially impaired students, whether it be substance abuse, mental illness, physical illness, aberrant behavior, so that evaluation of the student may take place and the student can be provided a supportive environment so the issue can be effectively addressed. *JA 1488*, MUSOM Student Impairment Assistance Policy. The Policy provides that upon becoming aware that a medical student may be impaired, the Course Director or Clerkship Director must remove the student from the education environment and complete a reasonable cause form setting forth the observed behavior. The student must report to the Associate Dean for Student Affairs and the Dean must investigate the case and refer the student for evaluation to determine whether the student is impaired. The evaluator must then submit a Performance Improvement Plan to the Dean setting forth the student's diagnosis, treatment plan and a specific recommendation which would allow the student to return to unimpaired functioning if possible. *Id.*

It is undisputed that Defendant failed to implement any of the provisions of its own Student Impairment Assistance Policy.

Zimmeck testified that she spoke with Dr. Veitia, Associate Dean for Student Affairs, in February 2010 and described to her feelings of sadness, isolation. *JA 1152-1153*, *Deposition of Zimmeck*. At that time, Dr. Veitia suggested that Zimmeck

3

consider receiving treatment or taking medications for depression.  *Id., JA 1153,* ll 21-23.

On or about December 17, 2010, the Academic Standards Committee at MUSOM placed Plaintiff on academic probation for receiving a "U" interim grade after one semester of a full year Advanced Patient Care course.  Zimmeck successfully passed the course at its conclusion in May 2011.  Yet, for some reason Zimmeck remained on academic probation. *JA 0016*, para. 17.

On or about May 27, 2011, Defendant Aaron McGuffin, the Senior Associate Dean for Student Affairs, filed a "critical incident report" against Zimmeck and referred her to the Academic and Professional Standards Committee (APSC).  Dr. McGuffin filed the report without prior notice to Zimmeck, for missing a NMBE Step 1 practice examination.  Zimmeck was unaware that the practice examination was mandatory and she fully resolved this issue with MUSOM.  Zimmeck took responsibility for not knowing the practice examination was mandatory and for missing it.  Zimmeck informed Dr. McGuffin that she would reschedule her official USMLE Step 1 examination to take the NBME practice examination, which she did on June 17, 2011. Dr. McGuffin stated that Zimmeck had made the right and mature decision and gave the impression to Zimmeck that the matter was resolved. *JA 0017*, para. 18.

On July 25, 2011, Zimmeck's treating physician, Dr. Michael Filak, diagnosed her as suffering from depression. *JA 0992*, *Deposition of Filak*, 27:12-15; *JA 0994*, 29:13-16. In order to treat Zimmeck's depression, Dr. Filak found that it was medically necessary to prescribe her the drug Lexapro to treat her symptoms of depression. *JA 1074*, *Medical Record of Dr. Filak, dated July 25, 2011*; and *JA 0995*, 30:2-10.

On August 26, 2011, Zimmeck took the official USMLE Step 1 examination, on which she scored in line with the average for all medical students in the United States. *JA 0017*, para. 19.

On October 7, 2011, Zimmeck was called to a meeting before the APSC. She was informed that the meeting was to discuss the May 27, 2011 "critical incident report" regarding her missing the May NMBE Step 1 practice examination. As such, Zimmeck was prepared to discuss how she handled the report and that the matter was fully resolved per Dr. McGuffin. *Id.*, para. 20. However, at the October 7, 2011 meeting the May 27, 2011 report was not discussed, rather, Zimmeck was interrogated by the committee regarding completely different issues or which she had no advance warning. One issue that was discussed was that in February 2010, during Zimmeck's first year of medical school, she discussed with Dr. Maria Veitia, the Associate Dean for Student Affairs, that she was having trouble adjusting to living in Huntington, WV. The committee asked Zimmeck about her adjustment to

living in West Virginia and also suggested that Zimmeck use anti-depressants. Although Zimmeck was not prepared to answer these types of questions as she had no notice that the committee would be asking her these types of questions, Zimmeck explained that she was now happy living in West Virginia and that she had begun taking Lexapro. *Id.*, para. 21.

On October 18, 2011, the APSC issued a letter to Zimmeck stating that based upon the October 7, 2011 meeting, she was to remain on academic probation. Even though Zimmeck was never previously found responsible for any "professional misconduct", the APSC stated that "Receipt of any incident report due to your professional misconduct will result in serious sanctions which can include suspension or possibly dismissal from the school of medicine." This decision is a clear violation of MUSOM policy. The policy states that students may be placed on academic probation for failing to correct deficiencies or for not receiving a passing grade. Zimmeck had no outstanding or unresolved academic deficiencies, yet she remained on academic probation. *Id.*, para. 22. MUSOM unilaterally imposed sanctions against Zimmeck for unsupported allegations of "professional misconduct" by imposing upon her a heavy burden, which was not imposed on other students at the school of medicine, saying that she may be dismissed from the program for any further reports of professional misconduct when Zimmeck had never had a prior report of professional misconduct. *JA 0018*, para. 23.

6

On November 8, 2011, Dr. Wesam Bolkhir submitted a report alleging violations of standards of professionalism by Zimmeck that occurred between October 31, 2011 and November 7, 2011. As the Deans of the medical school were aware, Zimmeck was suffering from unexpected and severe side effects from taking the drug Lexapro during that time period. *Id.*, para. 24. On November 9, 2011, Zimmeck met with Defendant LeGrow following Dr. Bolkhir's report and informed Dr. LeGrow that she was having suicidal ideations. Dr. LeGrow was also present at the APSC October 7, 2011 hearing when Zimmeck disclosed to MUSOM she had begun taking Lexapro. *Id.*, para. 25.

Zimmeck spoke to Dr. LeGrow, Associate Dean of Academic Affairs, on November 9, 2011. At that time they discussed Zimmeck's depression and Dr. LeGrow understood Zimmeck to be diagnosed as being clinically depressed, acknowledged that Zimmeck reported as being suicidal at times, and offered to assist Zimmeck in being admitted to a psychiatric hospital. *JA 1437*: 15-18, *JA 1439*: 5-18; *JA 1485*.

On November 23, 2011, Zimmeck met with Dr. LeGrow, Dr. Bolkhir, and Dr. Larry Dial to establish an action plan to resolve the allegations in Dr. Bolkhir's report. Zimmeck resumed her Internal Medicine rotation the following day. Even though MUSOM was aware that Zimmeck was on Lexapro and having suicidal ideations, they reinstated her in the Internal Medicine rotation. *Id.*, para. 26.

According to the MUSOM Student Impairment Assistance Policy, "The SOM has the authority to remove a student from clinical responsibilities if there is evidence of potential impairment that may impact patient care or appropriate student performance." MUSOM had knowledge that Zimmeck was impaired. MUSOM failed to follow their policy, thus putting Zimmeck and her patients in danger. *Id.*, para. 27.

Even though an action plan was in place regarding Dr. Bolkhir's November 8, 2011, which Zimmeck was successfully progressing through, that Zimmeck was no longer taking Lexapro, and there were no further incidents or allegations of professional or academic misconduct, on December 13, 2011, Zimmeck was informed that the APSC was to meet on December 19, 2011, to discuss the November 8, 2011 report. Zimmeck contacted Dr. LeGrow, who informed her that she did not need to be present at the meeting, that the meeting was a mere formality, and that she did not have to worry because she already had worked with MUSOM to develop an action plan to resolve the issues. Zimmeck relied on Dr. LeGrow assurances and, as a result, Zimmeck was not present to defend herself or to respond to any questions from the committee. Nonetheless, Zimmeck informed MUSOM that she was available by phone to participate in the meeting. Zimmeck was never contacted during the meeting. *JA 0019*, para. 28 and 29.

On the basis of the Dr. Bolkhir's report alleging multiple instances of impulsive, disinhibited and potentially disorganized behavior, Zimmeck was removed from the medical school. *JA 1496*, Report of Dr. Bolkhir, dated November 8, 2011; *JA 1494*, Dismissal Letter, dated December 19, 2011.

On December 28, 2011, Zimmeck was informed that the APSC recommended that she be dismissed from MUSOM as a result of Dr. Bolkhir's November 8, 2011, report and the decisions from the December 19, 2011 hearing, in which Zimmeck was not even allowed to participate or defend herself.

Zimmeck exhausted her administrative remedies by timely appealing the decision to dismiss her from MUSOM. On January 9, 2012, the Appeals Sub-Committee of the Dean's Advisory Committee conducted a meeting and upheld the decision of dismissal. Once again, Zimmeck was not permitted to attend the meeting and was again denied the opportunity to defend herself. *JA 0019*, para. 31.

Dr. David Marks stated that during medical school, Zimmeck was demonstrating symptoms of mood disorder including major depressive disorder and possibly a mixed state of bipolar disorder. *JA 1499,* Report of Dr. Marks. The violations complained of in Dr. Bolkhir's report were behaviors associated with a manifestation of Zimmeck's disabilities.

Dr. Marks' report makes it clear that the behaviors reported by Dr. Bolkhir show that Zimmeck was suffering the effects of mood disorder at that time. These

symptoms were exacerbated by taking Lexapro and may have been indicative of a bipolar mixed state. *Id.* Dr. Marks also indicated that Zimmeck's symptoms were suspicious for major depressive disorder, that Lexapro is known to cause emotional and behavioral side effects including suicidal feelings and mixed states. *Id*.

## B.    Procedural History

Zimmeck brought a lawsuit against MUSOM and the individual defendants named in this case seeking readmission to MUSOM and compensatory and punitive damages. Zimmeck's claims against the individual defendants and her constitutional claims against MUSOM were dismissed pursuant to FRCP 12(b)(6). The ADA and Sec. 504 claims against MUSOM continued through discovery and were ultimately dismissed on summary judgment pursuant to FRCP 56.

On June 18, 2013, Zimmeck filed a Complaint in the United States District Court, Southern District of West Virginia. *JA 0014*.

On September 09, 2013, Defendants filed a Motion for Partial Dismissal *JA 0030* and their Memorandum of Law in Support of Defendants' Motion for Partial Dismissal. *JA 0034*. Also on September 09, 2013, Defendants Marshall University Board of Governors, Aaron McGuffin, Tracy LeGrow, Robert C. Nerhood and Maria Veitia filed an Answer to Plaintiff's Complaint. *JA 0049.*

On September 23, 2013, Zimmeck filed an Opposition to Defendants' Motion for Partial Dismissal and Memorandum of Law in Support Thereof. *JA 0059.*

On October 03, 2013, Defendants Marshall University Board of Governors, Aaron McGuffin, Tracy LeGrow, Robert C. Nerhood and Maria Veitia filed their Motion to Dismiss Plaintiff's Section 1983 Claims *JA 0071* and Memorandum of Law in Support *JA 0167*.

On October 03, 2013, Defendants filed their Reply in Support of Defendants' Motion for Partial Dismissal. *JA 0185*.

On October 18, 2013, United States District Chief Judge Robert C. Chambers issued a Memorandum Opinion and Order granting in part Defendants Motion for Partial Dismissal. Counts 3, 4 and 5 of Zimmeck's Complaint were allowed to proceed against the individual Defendants in their individual capacities as to Zimmeck's request for prospective injunctive relief in those counts. The Court dismissed the remainder of Counts 3, 4 and 5. The Court dismissed Counts 6 and 8 in their entirety. The parties agreed that Zimmeck would bring Counts 1 and 2 solely against the Marshall University Board of Governors and that she will not seek punitive damages in Counts 1 and 2. The parties also agreed that Count 7 should be dismissed. The Court dismissed without prejudice those portions of Counts 1 and 2 which are inconsistent with the agreement among the parties and dismissed without prejudice Count 7. The Court ordered Zimmeck to file an Amended Complaint. *JA 0191*.

On October 21, 2013, Zimmeck filed her Opposition to Defendants Motion to Dismiss Plaintiff's Section 1983 Claims and Memorandum of Law in Support Thereof. *JA 0209*. On October 28, 2013, Defendants filed their Reply in Support of Defendants Motion to Dismiss Plaintiff's Section 1983 Claims. *JA 0227*.

On November 01, 2013, Zimmeck filed her Amended Complaint. *JA 0239*.

On November 15, 2013, Defendants filed their Motion to Dismiss Counts Three, Four and Five of the Amended Complaint *JA 0253* and Memorandum of Law in Support *JA 0256*. Also on November 15, 2013, Defendant Marshall University Board of Governors filed their Answer to Counts One and Two of the Amended Complaint. *JA 0259*.

On December 10, 2013, Zimmeck filed her Non-Opposition to Defendants' Motion to Dismiss Counts Three, Four and Five of the Amended Complaint with Respect to Marshall University and Request for Leave to File Second Amended Complaint. *JA 0272*.

On January 10, 2014, United States District Chief Judge Robert C. Chambers issued a Memorandum Opinion and Order granting Defendants' second and third Motions to Dismiss, dismissing Counts 3, 4 and 5 in their entirety, and granting Zimmeck leave to file a Second Amended Complaint. *JA 0292*. At that point all claims against the individual defendants were dismissed from the case.

On January 24, 2014, Zimmeck filed her Second Amended Complaint. *JA 0312*.

On February 05, 2014, Defendants filed their Answer to Second Amended Complaint. *JA 0321*. The only claims which remained at that point were the ADA and RA claims against MUSOM.

On February 02, 2015, Defendants filed their Motion for Summary Judgment (*JA 0434*) and Memorandum of Law in Support. *JA 0921*. On February 17, 2015, Zimmeck filed her Opposition to Defendants Motion for Summary Judgment and Memorandum of Law in Support Thereof. *JA 0951*. On February 26, 2015, Defendants filed a Supplement to Exhibit 3 of Defendants' Motion for Summary Judgment (*JA 1510*) and a Supplement to Exhibit 6 of Defendants' Motion for Summary Judgment. *JA 1520*. On February 26, 2015, Defendants filed a Reply in Support of Defendants' Motion for Summary Judgment. *JA 1526*.

The Pretrial Conference was held on April 27, 2015. *JA 1542*.

On April 28, 2015, United States District Chief Judge Robert C. Chambers issued an Order granting Defendants' Motion for Summary Judgment on the remaining claims against MUSOM. *JA 1579*. On May 06, 2015, United States District Chief Judge Robert C. Chambers issued his Memorandum Opinion. *JA 1580*. On May 07, 2015, United States District Chief Judge Robert C. Chambers issued his Judgment Order. *JA 1592*.

On May 26, 2015, Zimmeck filed her Notice of Appeal. *JA 1593*.

## IV.

## SUMMARY OF THE ARGUMENT

The Court should reverse the district court's judgment on MUSOM's motion for summary judgment with regard to the ADA and RA retaliation claim. The district court erred in finding that no material question of fact exist regarding whether Zimmeck was "otherwise qualified" to participate in the medical school program. MUSOM's rationale for Zimmeck's dismissal from the program is clearly pretextual because had the alleged "professionalism" violations really been the basis for her removal from the program, she would have been dismissed following those violations and not allowed to proceed to her third year clinical rotations. The timing of her dismissal after she sought accommodations for her disability and impairment created questions of fact regarding the real reason she was dismissed.

Second, the Court should reverse the district court's judgment on MUSOM's motion for summary judgment with regard to the ADA and RA discrimination claim. MUSOM has still never explained why it failed to institute its Student Impairment Assistance Policy with regard to Zimmeck rather than simply kick her out of school. Zimmeck was certainly eligible for the program and MUSOM had a duty, pursuant to the terms of its policy, to recognize her impairment and institute the impairment policy as a reasonable accommodation after she informed school officials of her

depression.  The actions of MUSOM in throwing her out of school rather than providing her with accommodations creates questions of fact whether MUSOM dismissed her on the basis of her disability.

Third, the Court should reverse the district court's judgment on MUSOM and the individual defendant's motion to dismiss the due process claims.  The law is clear that actions of school officials in removing students from university programs without any rational basis or in bad faith constitutes a substantive due process violation.  The district court erred in finding that no due process violation occurred when MUSOM removed Zimmeck from the medical without affording her any opportunity to defend herself and in retaliation for raising an issue of her disability whereby MUSOM would be required to provide her with accommodations.

The district court's ruling that MUSOM had no knowledge of Zimmeck's disability and request for accommodations prior to her removal from the program conflicts with the record in the case.  Likewise, the district court's ruling that Zimmeck has produced no evidence that she was removed from the program based upon her disability rather than MUSOM's claim that her removal was based upon continuing professionalism violations conflicts with the record in the case.

///

# V.

## STANDARD OF REVIEW

### A.    Summary Judgment Standard.

Whether a party is entitled to summary judgment is a question of law we review de novo using the same standard applied by the district court. *Canal Ins. Co. v. Distrib. Servs., Inc.*, 320 F.3d 488, 491 (4th Cir.2003). Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, "no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir.2003). On a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal quotation marks omitted).

### B.    12(b)(6) Standard.

The Fourth Circuit Court of Appeals reviews de novo the grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim. *McCorkle v. Bank of Am. Corp.*, 688 F.3d 164, 171 (4th Cir.2012). To survive a motion to dismiss pursuant to Rule 12(b)(6), Vitol's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [its] claims across the line from

conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

The plausibility standard requires a plaintiff to demonstrate more than "a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It requires the plaintiff to articulate facts, when accepted as true, that "show" that the plaintiff has stated a claim entitling him to relief, i.e., the "plausibility of 'entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557).

To emphasize the Federal Rules' requirements for stating claims that are warranted and therefore form a plausible basis for relief, the Supreme Court has held that a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. To discount such unadorned conclusory allegations, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, [556 U.S. at 679]. This approach recognizes that "naked assertions" of wrongdoing necessitate some "factual enhancement" within the complaint to cross "the line between possibility and plausibility of entitlement to relief." *Twombly*, 550 U.S. at 557 (internal quotation marks omitted).

At bottom, determining whether a complaint states on its face a plausible claim for relief and therefore can survive a Rule 12(b)(6) motion will "be a context-specific

17

task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" as required by Rule 8. *Iqbal*, [556 U.S. at 679,] (alteration in original) (citation omitted) (quoting Fed.R.Civ.P. 8(a)(2)). *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

## VI.

## <u>ARGUMENT</u>

**A.     The District Court Erred in Dismissing Zimmeck's ADA and Rehabilitation Act Claims.**

**1.     The District Court Erred in Dismissing Zimmeck's ADA and Rehabilitation Act Retaliation Claims.**

The ADA prohibits persons and entities from retaliating against an individual who engages in activity protected by the ADA. 42 U.S.C. § 12203 (2012). To state a claim for retaliation, a Plaintiff must prove "(1) that she has engaged in conduct protected by the ADA; (2) that she suffered an adverse action subsequent to engaging in the protected conduct; and (3) that there was a causal link between the protected activity and the adverse action." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002). The same elements apply to a claim for retaliation under the Rehabilitation Act. *See Hooven–Lewis v. Caldera*, 249 F.3d 259, 271-72 (4th Cir. 2001).

District Court Erred in finding that "Plaintiff did not even inform MUSOM of her alleged disabilities until after the initial decision to terminate her." *JA 1579, Order on MSJ*, p. 6.

The record shows that Zimmeck was dismissed in retaliation for raising the issue of her depression with MUSOM. Zimmeck testified that she spoke with Dr. Veitia, Associate Dean for Student Affairs, in February 2010 and described to her feelings of sadness, isolation. *JA 1152*, Deposition of Zimmeck. At that time, Dr. Veitia suggested that Zimmeck consider receiving treatment or taking medications for depression. *JA 1153,* ll 21-23.

Zimmeck also spoke to Dr. LeGrow, Associate Dean of Academic Affairs, on November 9, 2011. At that time they discussed Zimmeck's depression and Dr. LeGrow understood Zimmeck to be diagnosed as being clinically depressed, acknowledged that Zimmeck reported as being suicidal at times, and offered to assist Zimmeck in being admitted to a psychiatric hospital. *JA 1437: 15-18; JA 1439: 5-18*; *JA 1485*.

A request for reasonable accommodations is a protected activity capable of grounding an ADA retaliation claim. *Haulbrook v. Michelin N. America*, 252 F.3d 696, 706, n. 3 (4th Cir., 2001). Moreover, a close temporal proximity between the request for accommodations, and Zimmeck's dismissal from the medical school

weighs heavily in favor of finding a genuine dispute as to causation. *See Id.*, at 706 (finding that temporal proximity alone can create a genuine dispute to causation).

It is clear that administrators at MUSOM were well aware of Zimmeck's depression as early as February 2010. Certainly, on November 8, 2011 was aware of Zimmeck's serious mood symptoms, including suicidal feelings, from which Zimmeck was suffering. Rather than addressing her impairment and providing the reasonable accommodation to which she was entitled, a genuine dispute exists whether MUSOM retaliated against Zimmeck for raising the issue of impairment which required MUSOM to implement accommodations.

### 2. The District Court Erred in Dismissing Zimmeck's ADA and Rehabilitation Act Discrimination Claims.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Constantine v. Rectors, George Mason Univ.*, 411 F.3d 474 (4th Cir., 2005) quoting 42 U.S.C. § 12132. Similarly, § 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Id*. quoting 29 U.S.C. § 794(a). In general, a plaintiff seeking recovery for violation of either statute

must allege that (1) she has a disability, (2) she is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability. *Baird v. Rose*, 192 F.3d 462, 467-70 (4th Cir. 1999); *Doe v. University of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264-65 & n. 9 (4th Cir. 1995).

The causation standards under Title II of the ADA and § 504 of the Rehabilitation Act are significantly dissimilar. *Baird*, 192 F.3d at 469. A plaintiff seeking relief under Title II of the ADA must prove that disability "played a motivating role" in the adverse action, while a plaintiff seeking relief under § 504 of the Rehabilitation Act must prove that the defendants' discriminatory conduct was "solely by reason" of the plaintiff's disability. *Id.* at 469-70.

### a.    The District Court Erred in Finding Zimmeck was not "Otherwise Qualified" for the Program.

A qualified individual is one who, with or without reasonable modifications to rules, policies, or practices,... meets the essential eligibility requirements for participation in a program or activity. 42 U.S.C. § 12131(2); *see also Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979) ("An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap."). A plaintiff asserting a violation of the ADA or Rehabilitation Act bears the burden to establish that he is qualified. *Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209, 213 (4th Cir.

21

1994).  To determine whether a plaintiff has satisfied this burden, a court must decide whether he has presented sufficient evidence to show (1) that he could satisfy the essential eligibility requirements of the program, i.e., those requirements "'that bear more than a marginal relationship to the [program] at issue,' and (2) if not, whether 'any reasonable accommodation by the [defendant] would enable'" the plaintiff to meet these requirements.  Id. (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393–94 (5th Cir. 1993)).

Federal law mandates that federal grantees and public accommodations make "reasonable," but not "substantial" or "fundamental," modifications to accommodate persons with disabilities.  *See Alexander v. Choate*, 469 U.S. 287, 300 (1985).  A modification is not reasonable if it either imposes undue financial and administrative burdens ... or requires a fundamental alteration in the nature of the program.  *Sch. Bd. v. Arline*, 480 U.S. 273, 287 n. 17 (1987); *see also PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 n. 38 (2001) (requiring that a modification be reasonable, be necessary, and not fundamentally alter the nature of the program).  A modification to "an essential aspect" of the program constitutes a "fundamental alteration" and, therefore, is an unreasonable accommodation. *PGA Tour*, 532 U.S. at 682–83.  Although determination of the reasonableness of a proposed modification is often fact-specific, a court may grant summary judgment in favor of a defendant if the plaintiff fails to present evidence from which a jury may infer that

the accommodation is "reasonable on its face, i.e., ordinarily or in the run of cases," or if the defendant establishes as a matter of law that the proposed modification will cause "undue hardship in the particular circumstances." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002).

In this case, MUSOM argues that Zimmeck was not otherwise qualified to participate in the medical school curriculum due to several "professionalism" violations. This rationale for Zimmeck's dismissal from the program is clearly pretextual because had these alleged "professionalism" violations really been the basis for her removal from the program, she would have been dismissed following those violations and not allowed to proceed to her third year clinical rotations. It was not until Zimmeck began speaking with the medical school administrators, namely Dr. Legrow, where she discussed her issues of depression and sought guidance from the medical school regarding how to address those concerns with her clinical performance in light of her disability, that she was dismissed from the medical school.

Even if Zimmeck could not satisfy the essential eligibility requirements of the program, MUSOM was required to determine if there was any reasonable accommodation that would enable Zimmeck to meet these requirements. MUSOM failed to do so.

Although great respect is afforded to professional judgments of the university on this issue, in doing so, the district court must take care "not to allow academic decisions to disguise truly discriminatory requirements." *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 463 (4th Cir. 2012) quoting *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1048 (9th Cir. 1999). The court assiduously reviews the record to ensure that the educational institution has "conscientiously carried out [its] statutory obligation" to provide reasonable accommodations to persons with disabilities. *Halpern*, 669 F.3d at 463 (quoting *Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 25-26 (1st Cir. 1991) (internal quotation marks omitted). The district court failed to ensure that MUSOM carried out its statutory obligation.

The district court relied heavily upon *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 463 (4th Cir. 2012) in determining that Zimmeck was not otherwise qualified to participate in the program due alleged professionalism violations. Yet, *Halpern* is easily distinguishable from the instant case because in that case, the medical school did not have a Student Impairment Assistance Policy that required the medical school to take affirmative action in evaluating the plaintiff to determine what accommodations could be provided to the plaintiff to address his impairment and professionalism concerns.

On the other hand, in the instant case, MUSOM did have in place a Student Impairment Assistance Policy. Had MUSOM implemented this policy as they were

24

required to do once they learned of Zimmeck's disability, Zimmeck would have received this reasonable accommodation to assist her in meeting the essential eligibility requirements of the program and addressed her alleged professionalism lapses that manifested due to her disability. *JA 1488*. The stated purpose of this policy is to promote student wellness through early detection of potentially impaired students, whether it be substance abuse, mental illness, physical illness, aberrant behavior, so that evaluation of the student may take place and the student can be provided a supportive environment so the issue can be effectively addressed. The Policy provides that upon becoming aware that a medical student may be impaired, the Course Director or Clerkship Director must remove the student from the education environment and complete a reasonable cause form setting forth the observed behavior. *Id.*

This case is further distinguished from *Halpern* because the plaintiff in that case did not request a remediation plan or inform the medical school of his disability until *after* he was dismissed from the program. *Halpern*, 669 F.3d at 465. Whereas in this case MUSOM had knowledge of Zimmeck's disability and impairment prior to dismissing her, yet failed to implement the assistance policy.

In this case, the district court erroneously stated that Zimmeck tried "to shift the burden of identifying a disability and an appropriate accommodation onto the defendant." *JA 1589, Order on MSJ*, p. 10. This finding is contrary to the record in

the case.  It is clear that Zimmeck spoke to Dr. LeGrow on November 9, 2011 and discussed her depression.  Dr. LeGrow understood Zimmeck to be diagnosed as being clinically depressed and potentially suicidal, thus acknowledging her impairment and/or disability. *JA 1437, JA 1439*, Deposition of Dr. LeGrow, 70:15-18, 72:5-18; *JA 1485*.  Pursuant to the MUSOM Student Impairment Assistance Policy, it was MUSOM's duty at that point to evaluate Zimmeck and to provide a supportive environment so the issue could be effectively addressed. *JA 1489*. Unlike the plaintiff in *Halpern*, Zimmeck discussed her disability and impairment with school officials prior to her dismissal and she did not attempt to implement her own remediation plan.  Indeed, MUSOM had their impairment assistance policy in place and, pursuant that policy, MUSOM was required to inform Zimmeck of the policy once they had knowledge of her impairment and implement that policy.  *Id.* MUSOM did neither.

According to the Student Impairment Assistance Policy, the student must report to the Associate Dean for Student Affairs and the Dean *must* investigate the case and refer the student for evaluation to determine whether the student is impaired. *Id*. (emphasis added).  The evaluator must then submit a Performance Improvement Plan to the Dean setting forth the student's diagnosis, treatment plan and a specific recommendation which would allow the student to return to unimpaired functioning if possible.  *Id.*  In Zimmeck's case, MUSOM completely

failed to comply with its own Policy and did not send her for an evaluation or Performance Improvement Plan.

Placing Zimmeck in the MUSOM Student Impairment Assistance Policy constituted a reasonable accommodation for her disability and it was MUSOM's duty to recognize Zimmeck's impairment and implement that policy. Through her completion of the plan, Zimmeck could have met MUSOM's standards for professionalism. On the basis of the report of Dr. Bolkhir, Zimmeck was removed from the medical school. *JA 1494*. It is clear that the violations complained of in Dr. Bolkhir's report were behaviors associated with a manifestation of Zimmeck's disabilities. Dr. Bolkhir reported multiple instances of impulsive, disinhibited and potentially disorganized behavior. *JA 1496*. The report of Dr. Marks makes it clear that the behaviors reported by Dr. Bolkhir show that Zimmeck was suffering the effects of mood disorder at that time. These symptoms were exacerbated by taking Lexapro and may have been indicative of a bipolar mixed state. *JA 1499*. Dr. Marks also indicated that Zimmeck's symptoms were suspicious for major depressive disorder, that Lexapro is known to cause emotional and behavioral side effects including suicidal feelings and mixed states. *Id*.

Moreover, even if MUSOM does not believe that its own policy regarding impaired students was a reasonable accommodation, MUSOM is required under the ADA to engage in an interactive process to identify a reasonable accommodation.

27

*Haneke v. Mid–Atl. Capital Mgmt.*, 131 Fed.Appx. 399, 400 (4th Cir. 2005). MUSOM failed to do so in this case and simply removed Zimmeck from medical school because it did not want to deal with a student who suffered from a disability.

Accordingly, Zimmeck presented sufficient evidence which shows that she was otherwise qualified to participate in the medical school curriculum and that she was dismissed from the program on the basis of alleged professionalism violations, which Dr. Marks has shown to be manifestations of her disabilities. Moreover, the district court's finding that Zimmeck did not request accommodations until her appeal is not supported by any evidence. In fact, Zimmeck reported her disability to MUSOM in February 2010, again in November 2011, and Dr. Bolkhir should have been aware of it at the time the report was submitted regarding Zimmeck's manifestations of her disabilities. The accommodation which should have been presented to Zimmeck pursuant to MUSOM's Student Impairment Assistance Policy was never mentioned to her in violation of that policy which requires the school to do so. Had MUSOM properly complied with its own Policy, the reasonable accommodation would have been in place.

### b.    The District Court Erred in Finding Zimmeck did not Present Sufficient Evidence that She was Excluded on the Basis of Her Disability.

Once again, the district court relied heavily upon *Halpern* in finding Zimmeck did not present sufficient evidence that she was excluded on the basis of her

disability.  In *Halpern*, the Fourth Circuit held that "'misconduct—even misconduct related to a disability—is not itself a disability' and may be a basis for dismissal. *Id. at* 465 (quoting *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 n. 3 (4th Cir.1997)). "Where a professional school has reasonably determined based on an identifiable pattern of prior conduct that a student is unfit to join his chosen profession, federal law does not obligate the school to allow that student to remain in and graduate from its educational program." *Id.* at 466-67.  In *Halpern*, the school presented evidence that the plaintiff's pattern of continually unprofessional conduct, which he later claimed were caused by his disability, was a reasonable basis for his dismissal.  *Id.* at 466-467.

In the instant case, MUSOM presented no such evidence that it was unaware of Zimmeck's disability and of its obligation to institute the Student Impairment Assistance Policy *prior to* Zimmeck's dismissal.  Zimmeck has presented evidence that MUSOM's claims of a continued pattern of unprofessional conduct as being the basis for her dismissal was clearly pretextual because, had these alleged "professionalism" violations truly been the basis for her removal from the program, she would have been dismissed following those violations and would not have been allowed to proceed to her third year clinical rotations.

The Fourth Circuit has found that a close temporal proximity between the request for accommodations and a dismissal from the medical school weighs heavily

29

in favor of finding a genuine dispute as to causation. *See Haulbrook*, 252 F.3d at 706, n. 3 (finding that temporal proximity alone can create a genuine dispute to causation).

It is clear that administrators at MUSOM were well aware of Zimmeck's depression as early as February 2010. Certainly, on November 8, 2011 MUSOM was aware of Zimmeck's serious mood symptoms, including suicidal feelings, from which Zimmeck was suffering. *JA 1437: 15-18; JA 1439: 5-18*; *JA 1485*. Accordingly, unlike the defendant in *Halpern*, MUSOM had knowledge of Zimmeck's disability well before her dismissal from the medical school. It was not until Zimmeck began speaking with the medical school administrators, namely Dr. Legrow, and discussed her issues of depression and sought guidance from the medical school regarding how to address those concerns with her clinical performance in light of her disability, that she was dismissed from the medical school.

Unlike in *Halpern*, genuine issues of material fact exist in this case whether Zimmeck was dismissed on the basis of her disability after she spoke to Dr. LeGrow about her impairment and whether MUSOM should have instituted the Student Impairment Assistance Policy at that Point, as opposed to MUSOM's claim that she was dismissed on the basis of continuing professionalism violations. Accordingly, material questions of fact exist regarding all elements of Zimmeck's prima facie case

against MUSOM for violations of the ADA and Rehabilitation Act and the district court erred in dismissing these claims on summary judgment.

**B.    The District Court Erred in Dismissing Zimmeck's Due Process Claims.**

**1.    Zimmeck Established in Her Complaint that She was Denied Her Right to Pre-deprivation Due Process, Including Prior Notice and a Full Opportunity To Be Heard Prior to Her Dismissal from MUSOM.**

Zimmeck's dismissal from MUSOM was for disciplinary reasons.   On November 8, 2011, Dr. Bolkhir submitted a report reporting alleged violations of standards of professionalism of Plaintiff that occurred between October 31, 2011, and November 7, 2011.   *JA 0018*, para. 24.   Zimmeck met with Dr. LeGrow, Dr. Bolkhir, and Dr. Larry Dial to establish an action plan to resolve the allegations in Dr. Bolkhir's report.  Plaintiff resumed her Internal Medicine rotation the following day. *Id.*, para. 26.

Nonetheless, without any further incidents or allegations of professional or academic misconduct, and as Zimmeck was successfully progressing through her action plan, the APSC met on December 19, 2011 to discuss the November 8, 2011 report.  Zimmeck contacted Dr. LeGrow, who informed her that she did not need to be present at the meeting, that the meeting was a mere formality, and that she did not have to worry because she already had worked with MUSOM to develop an action plan to resolve the issues. *JA 0019*, para. 28.  As a result, Zimmeck was not present to defend herself or to respond to any questions from the committee. *Id.*

31

The APSC recommended that Zimmeck be dismissed from MUSOM. *Id.*, para. 30. This was obviously a disciplinary dismissal because Zimmeck was not failing any courses, was successfully complying with the action plan agreed to between Zimmeck and Dr. LeGrow, Dr. Bolkhir, and Dr. Dial, and was progressing through her internal medicine rotation.

To protect such a property or liberty interest, *Goss v. Lopez*, 419 U.S. 565, 581 (1975) held that a student dismissed from a public school for disciplinary reasons must "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."  The Court stated:

> [I]t would be a strange disciplinary system in an education institution if no communication was sought by the disciplinarian with the student in an effort to inform him of his dereliction and to let him tell his side of the story in order to make sure that an injustice is not done. . . . [R]equiring effective notice and informal hearing permitting the student to give his version of the events will provide a meaningful hedge against erroneous action.  At least the disciplinarian will be alerted to the existence of disputes about facts and arguments about cause and effect. Id. at 580, 583-84 (emphasis added). The Court went on to note: Requiring that there be at least an informal give-and-take between student and disciplinarian, preferably prior to the suspension, will add little to the fact finding function where the disciplinarian himself has witnessed the conduct forming the basis for the charge.  But things are not always as they seem to be, and the student will at least have the opportunity to characterize his conduct and put it in what he deems the proper context. . . . Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures.

*Id.* at 584.

It is clear in this case that none of the individual defendants spoke with Zimmeck regarding potential dismissal as a result of Dr. Bolkhir's report. The only time Zimmeck was permitted to speak with anybody from MUSOM regarding this report was when she met with Dr. LeGrow, Dr. Bolkhir, and Dr. Larry Dial to establish an action plan to resolve the allegations in Dr. Bolkhir's report. Zimmeck was complying with the action plan and was never put on notice that she could be dismissed from MUSOM regardless of her compliance with the action plan.

Moreover, Dr. LeGrow informed Zimmeck that the ASPC would conduct a meeting to discuss Dr. Bolkhir's report but blatantly lied to Zimmeck in stating that she did not need to be present at the meeting, that the meeting was a mere formality, and that she did not have to worry because she already had worked with MUSOM to develop an action plan to resolve the issues. As a result, Zimmeck was not even aware she could be subject to dismissal as a result of any decisions made by the APSC and was not present to defend herself or to respond to any questions from the committee. There was no effort to determine Zimmeck's "side of the story" or identify disputes about facts and arguments" to ensure than "an injustice [was] not done." *See Goss*, 419 U.S. at 580.

*Castle v. Marquardt*, 632 F. Supp. 2d 1317 (N.D. Ga. 2009) is on point. In *Castle*, a college expelled a student from a licensed practical nursing program for alleged inappropriate behavior. The college afforded plaintiff an appeal after her

33

expulsion. Citing *Goss v. Lopez* and *Matthews v. Eldridge*, 424 U.S. 319 (1976), the district court stated that the right to procedural due process includes: [T]he student having "the opportunity to be heard at a meaningful time and in a meaningful manner." *Matthews*, 424 U.S. at 333. No opportunity could be less meaningful than one provided after a final adverse judgment has already been made. Thus, as a general rule, *Matthews* requires that a student be able to present his or her side of the story before a decision is rendered as to the student's fate. *Castle*, 632 F. Supp. 2d at 1330-31. The defendants in Castle were unable to convince "the court that, as a matter of law, this is one of those 'rare and extraordinary cases' where a post-deprivation hearing is constitutionally sufficient." *Id.*, at 1332 (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570 n.7 (1972)); *see also Bell v. Burson*, 402 U.S. 535, 542 (1971) (noting that procedural due process requires a pre-deprivation hearing "except in emergency situations"); *Gates v. United States*, 600 F.3d 333, 341 (4th Cir. 2010) (reversing counsel's contempt conviction because no prior notice of alleged contempt, no meaningful opportunity to respond, and "lack of clarity as to Gates's allegedly contemptuous conduct"). Any argument made by MUSOM in this case that Zimmeck had the opportunity to appeal and discuss the issues with the Dean is irrelevant to whether she was afforded adequate due process as she was never provided with the required pre-deprivation hearing, she was not

34

permitted to address the APSC, and she was not even put on notice that she was subject to dismissal.

MUSOM failed to inform Zimmeck of any possibility that she could be dismissed from the medical school prior to the APSC meeting. MUSOM failed to inform her that there was any concern at all with her behavior after the action plan was put in place. In fact, it was just the opposite: Dr. LeGrow told Zimmeck she did not need to worry about the APSC meeting, she did not need to be present because she already had worked with MUSOM to develop an action plan to resolve the issues.

The first and only time Zimmeck learned of the possibility of dismissal was on December 28, 2011, when MUSOM informed her that the APSC recommended that she be dismissed from the medical school as a result of Dr. Bolkhir's November 8, 2011, report and the decisions from the December 19, 2011, hearing. Such treatment is woefully constitutionally inadequate because no pre-deprivation hearing was provided, and Zimmeck received no process. Even in the case cited by MUSOM in their motion to dismiss, *Butler v. Rector & Bd. of Visitors of the College of William and Mary*, 121 Fed.App'x 515 (4th Cir. 2005), the court noted that the defendant had provided "the rudiments of procedural due process - notice and an opportunity to be heard." *Id.*, at 520. The college informed Butler of the most serious charges and complaints against her and provided her with an opportunity to respond. She

35

was given written copies of the most serious charges against her. Additionally, she was given notice of the most grievous punishment, expulsion, 12 days before she met with Dean Laughlin to respond. At that meeting, she not only disputed evidence against her, but also provided her own evidence arguing that she should not be expelled from the program. Only after considering that evidence, along with the unanimous recommendation of the faculty as well as Associate Dean Ward, did Dean McLaughlin decide to expel Butler. *Id.*

Despite the evidence to the contrary, the district court found that Zimmeck was dismissed for academic reasons. Even if she was, Zimmeck was still entitled to due process. "The essence of due process is the requirement that a person in jeopardy of a serious loss [be given] notice of the case against him and an opportunity to meet it." *Lewin v. Medical College of Hampton Roads*, 916 F. Supp. 1161 (E.D. Va. 1996) quoting *Matthews v. Eldridge*, 424 U.S. 319, 348 (1976). Dismissal of a student for academic reasons comports with the requirement of procedural due process if the student had prior notice of faculty dissatisfaction with his or her performance and of the possibility of dismissal and if the decision to dismiss the student was careful and deliberate." *Lewin*, 916 F.Supp. at 1167, quoting *Schuler v. Univ. of Minn.*,788 F.2d 510, 514 (8th Cir. 1986), *cert. denied*, 479 U.S. 1056 (1987). The *Schuler* decision relied upon *Board of Curators of the Univ. of Missouri v. Horowitz*, 435 U.S. 78 (1977), where the United States Supreme Court

36

made clear that even in an "academic dismissal" situation of a student involved in a medical clinical, more process is due than what was provided to Zimmeck. In *Horowitz*, a medical student was dismissed after her clinical course in her final year of study. *Id.*, at 79. The Court stated that she was provided at least as much due process as constitutionally required. "The school informed respondent of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment." *Id.*, at 85.

MUSOM in this case did no such thing for Zimmeck. Even if MUSOM had provided Zimmeck sufficient procedural due process for an academic dismissal, the district court could have overridden the decision if "it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Lewin*, 916 F. Supp. at 1167 (quoting *Ewing*, 474 U.S. at 225). Accepted academic norms include passing a student in a class where she has explicitly obtained the grades required for passing.

Zimmeck, in contrast, received none of the notice or opportunity to be heard. Accordingly, Zimmeck properly alleged that she was denied procedural due process and the district court erred in dismissing this claim.

2.    **Zimmeck Established in Her Complaint that the Conduct of MUSOM Officials in Dismissing Her from the Medical School "Shocks the Conscience" for Purposes of Her Substantive Due Process Claim.**

A substantive due process violation exists where the defendant's conduct was "so arbitrary and egregious as to 'shock the conscience.'" *Butler,* 121 F. App'x at 519. To establish a violation of substantive due process, a student must demonstrate arbitrary and capricious conduct on the part of university officials by showing that there was no rational basis for the university's decision or must show that the dismissal was motivated by bad faith or ill will unrelated to academic performance. *See Board of Curators of University of Missouri v. Horowitz,* 435 U.S. 78, 91-92 (1978); *Schuler v. University of Minnesota,* 788 F.2d 510, 515 (8th Cir.1986); see also *Regents of the University of Michigan v. Ewing,* 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985) (student may maintain substantive due process claim if university's actions constituted a "substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment").

In cases similar to Zimmeck's case, courts have found claims that allege a dismissal from a university for reasons other than the quality of work, or in bad faith, could properly state a cause of action for a substantive due process violation. For example, in *Connelly v. University of Vermont and State Agr. Col.*, 244 F.Supp. 156 (D. Vt., 1965), the plaintiff alleged that the agent of defendant's College of Medicine

38

who taught plaintiff from July 1 to July 16, 1964, decided early in said period that he would not give plaintiff a passing grade in said Pediatric-Obstetrics course regardless of his prior work in the Spring and regardless of the quality of his work in said make-up period.  The plaintiff also alleged that the action of defendant in dismissing him was "summary and arbitrary."  The allegation that the plaintiff was failed by an instructor who had made up his mind to fail him before he completed the course was equivalent, in that court's opinion, to an allegation of bad faith, arbitrariness, and capriciousness on the part of the said instructor, and if proven, the court stated that it would be justified in affording the plaintiff appropriate relief.  *Id.*, at 161.

Likewise, Zimmeck has alleged in this case the basis of her dismissal was Dr. Bolkhir's report.  Dr. LeGrow informed Zimmeck that the ASPC would conduct a meeting to discuss Dr. Bolkhir's report but blatantly lied to Zimmeck in stating that she did not need to be present at the meeting, that the meeting was a mere formality, and that she did not have to worry because she already had worked with MUSOM to develop an action plan to resolve the issues.  As a result, Zimmeck was not even aware she could be subject to dismissal as a result of any decisions made by the APSC and was not present to defend herself or to respond to any questions from the committee. ***JA 0017, JA 0018***, para. 21 and 24.  The allegation that Zimmeck was lied to by MUSOM administrators in order to prevent her from defending herself,

39

denied all process to which she was entitled, and dismissed from the MUSOM based upon a report wherein Zimmeck and MUSOM had already reached an agreement to resolve the issue in the report constitutes bad faith, arbitrariness, and capriciousness on the part of MUSOM. Accordingly, Zimmeck's complaint sets forth MUSOM's bad faith, arbitrary and capricious decision-making, and Zimmeck's substantive due process claim should not have been dismissed.

Additionally, Zimmeck has shown that her dismissal was based upon her disability and in retaliation for her raising the issue of her impairment and disability, which would trigger the implementation of the Student Impairment Assistance Policy.

It is clear that administrators at MUSOM were well aware of Zimmeck's depression as early as February 2010. Certainly, on November 8, 2011, MUSOM was aware of Zimmeck's serious mood symptoms, including suicidal feelings, which Zimmeck was suffering. Rather than addressing her impairment and providing the reasonable accommodation to which she was entitled, a genuine dispute exists whether MUSOM retaliated against Zimmeck for raising the issue of impairment which required MUSOM to implement accommodations.

The record in this case shows that there was no rational basis for Zimmeck's dismissal because it was based upon her disability and request for accommodations. It has also been shown that her dismissal was motivated by bad faith unrelated to

40

academic performance because MUSOM chose to remove Zimmeck from medical school rather than comply with its student assistance impairment policy. Accordingly, MUSOM's conduct in dismissing Zimmeck from the program constitutes the type of behavior in line with *Connelly* for the purposes of due process, and the district court erred in finding that Zimmeck did not plead conduct which "shocks the conscience."

## VII.

## CONCLUSION

For the reasons set forth above, the district court erred in finding that no material questions of fact exist whether Zimmeck was "otherwise qualified" for the program; whether Zimmeck was excluded on the basis of her disability versus whether she was excluded due to professionalism violations as MUSOM claims. The district court erred in finding that no material questions of fact exist regarding whether Zimmeck engaged in conduct protected by the ADA or Rehabilitation Act before she was terminated from MUSOM. Therefore the dismissal of her ADA and Rehabilitation Act claims should be reversed. Moreover, Zimmeck adequately plead her denial of pre-deprivation due process and conduct on the part of MUSOM, which

shocks the conscience. Therefore, the district court's decision dismissing Zimmeck's claims should be reversed.

DATED this 4th day of August, 2015.

**THE BACH LAW FIRM, LLC**

By  *Jason J. Bach*
      JASON J. BACH, ESQ.
      7881 W. Charleston Blvd., Ste. 165
      Las Vegas, Nevada 89117
      Telephone: (702) 925-8787
      Attorney for Appellant

# VIII.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant believes that reference to existing precedent and the district court record will be beneficial to the Court in resolving this appeal, and that oral argument will also aid in the decisional process.  Accordingly, Appellant respectfully requests the opportunity to present oral argument.

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 15-1572        **Caption:** Zimmeck v. Marshall University Board of Governors

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[✓] this brief contains _____ 9424 _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[✓] this brief has been prepared in a proportionally spaced typeface using
Word 2013 _____ [*identify word processing program*] in
14 point Times New Roman _____ [*identify font size and type style*]; **or**

[ ] this brief has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Jason J. Bach _____

Attorney for Appellant _____

Dated: 8-4-15 _____

# X.

## CERTIFICATE OF SERVICE

The undersigned certifies that on this fourth day of August, 2015, he caused the foregoing Appellant's Opening Brief to be filed using the Court's Electronic Case Filing System, which will automatically generate and send by email a Notice of Docket Activity to counsel for all parties.  The undersigned also certifies that on the fifth day of August, 2015, as required by Local Rule 31(d), he caused eight (8) true and correct copies of the foregoing brief to be transmitted to the Clerk of Court by third-party commercial carrier by two-day delivery.


　　　　　　　　　　*Jason J. Bach*
　　　　　　　　　　JASON J. BACH, ESQ.

45